NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0170n.06

No. 20-3590

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MARIA CRISTINA ROSA-MEJIA;
PABLO ERNESTO GUEVARA-ROSA,

                Petitioners,

   v.

MERRICK B. GARLAND, Attorney General,

                Respondent.

FILED
Mar 31, 2021
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW FROM THE BOARD OF IMMIGRATION APPEALS

BEFORE:    CLAY, McKEAGUE, and MURPHY, Circuit Judges.

**CLAY, Circuit Judge.**  Pursuant to 8 U.S.C. § 1252(a), Petitioners Maria Cristina Rosa-Mejia and Pablo Ernesto Guevara-Rosa seek review of an order by the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") denial of their application for asylum and withholding of removal. For the reasons set forth below, Petitioners' application is denied.

## I.     BACKGROUND

A. Factual Background

In March of 2015, Maria Cristina Rosa-Mejia and her son, Pablo Ernesto Guevara-Rosa, migrated to the United States without valid entry documentation. Until 2015, Maria lived in El Salvador, where she was married to her partner Juan and had four children from a prior relationship. In July 2014, her other son Cesar left for the United States, and twenty days later, Maria began to receive phone calls from Salvadorian gangs requesting rent money from Cesar. In

September 2014, Cesar informed his mother that gangs had been extorting him for monthly payments of $200. Before Cesar left El Salvador, he and his father, Maria's former partner, were involved in an agriculture business that gangs in the area knew was profitable. The gangs made increasing demands of Cesar and eventually requested $8000 from him, which he refused, and then fled to the United States with his wife, child and in-laws. Cesar then told his mother to leave their home to avoid gang violence.

Heeding her son's message, Maria left that same day with Juan, her husband of three years, and her other son Pablo, and traveled to San Jose La Cueva, San Juan Opico, a neighborhood two hours from her home. A month later, on October 16, gang members arrived at their residence and began shooting, and injured her husband Juan. As Maria and Pablo fled, Pablo was shot in the arm. Once Maria and Pablo were safe, Maria called the police, who instructed her not to go back to her home until they arrived. Accompanied by the police, Maria went back to her home and discovered that her husband had been shot to death. The police instructed Maria to pack her things and never return; this would be the last time she communicated with the Salvadorean police.

Thereafter, Maria and Pablo moved to Santa Ana, El Salvador to stay with Maria's sister. During this time, Maria received no new threats from gangs, but she remained hidden out of fear. Four months later, Maria left her sister's home after deciding it was too small for the entire family. Still fearing the gangs, Maria decided it was best to flee to the United States instead of elsewhere in El Salvador. On March 17, 2015, Maria and Pablo entered the United States by crossing the Rio Grande River on a raft.

B. Procedural History

A federal Border Patrol Agent encountered Maria and her son Pablo in the Rio Grande Valley, Texas area and arrested them for entering the United States without visas. Following Maria

and Pablo's arrests, the Department of Homeland Security (DHS) conducted a credible fear interview on April 2, 2015. Maria expressed that the MS gang had extorted her son, retaliated against her, and that the police could not protect her. In an interview with Pablo, he expressed that he was afraid to return to El Salvador because gang members would kill him. An asylum officer determined that Maria could be found credible in a full asylum or withholding of removal hearing because of her membership in a particular social group.

On April 7, 2015, DHS initiated removal proceedings for Maria and Pablo to return them back to El Salvador. On November 21, 2017, Maria and Pablo had a merits hearing for asylum before an Immigration Judge. Following these proceedings, on June 19, 2018, an IJ denied Maria and Pablo's asylum petition. In weighing whether Maria and Pablo had experienced past persecution, the IJ determined that they had put forth insufficient evidence to demonstrate that the gangs that harmed Maria's family were motivated by the family's membership in a particular social group. The IJ ruled that, at best, Maria and Pablo were subjected to violent generalized crime similar to what occurs in many parts of El Salvador. Additionally, the IJ found that a substantial change in circumstances had occurred, given that Cesar's father was living in El Salvador without any reported violence. For these reasons, the IJ concluded that Maria and Pablo had not met their burden of proving that they would be persecuted and denied their claims for asylum and withholding of removal. Thereafter, Maria and Pablo appealed the IJ's decision to the Board of Immigration Appeals. The BIA dismissed their appeal, after concluding that Maria and Pablo had not met their burden of proof for asylum or withholding of removal. This appeal followed.

## II. DISCUSSION

### 1. Standard of Review

We review the BIA's findings of fact for "substantial evidence" whereas "questions of law are reviewed de novo." *Marikasi v. Lynch*, 840 F.3d 281, 286 (6th Cir. 2016) (quoting *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012)). We "defer to the agency's findings of fact if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020) (quoting *Abdurakhmanov*, 735 F.3d at 345). Under that standard, "[w]e may not reverse such findings simply because we would have decided them differently." *Al-Ghorbani*, *v. Holder*, 585 F.3d 980, 991 (6th Cir. 2009) (citing *Gishta v. Gonzales*, 404 F.3d 972, 978 (6th Cir. 2005)). "[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Whenever the BIA "issues a separate opinion, rather than summarily affirming the [IJ's] decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent that the BIA has adopted the IJ's reasoning . . . we also review the IJ's decision." *Al-Ghorbani*, 585 F.3d at 991.

### 2. Relevant Legal Principles

Under the Immigration and Nationality Act ("INA"), the United States has discretion to grant asylum to persons considered to be refugees. 8 U.S.C. § 1158(b)(1)(A). To qualify as a refugee, an applicant must show that he or she is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of" his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A). An

applicant must also demonstrate a nexus between one of the five characteristics listed above and one of the "central reason[s] for [his or her persecution]." 8 U.S.C. § 1158(b)(1)(B)(i).

Persecution does not include every type of treatment society regards as unfair, unjust, unlawful, or unconstitutional. *Marikasi*, 840 F.3d at 288. Rather, persecution is defined as a "threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in ways regarded as offensive." *Thap v. Mukasey*, 544 F.3d 674, 681 (6th Cir. 2008) (quoting *Matter of Acosta*, 19 I & N Dec. 211, 222-23 (BIA 1985)). To establish a well-founded fear of persecution, the application "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) (quoting *Dokic v. INS*, No. 92-3592, 1993 WL 265166, *5 (6th Cir. July 15, 1993)). The applicant must then show persecution could not be avoided by relocating to another part of the country. 8 C.F.R. § 1208.13(b)(2)(ii). In addition, if the applicant alleges persecution from non-government actors, the applicant must show that the government was unable or unwilling to control the persecutors. *K.H. v. Barr*, 920 F.3d 470, 475 (6th Cir. 2019).

To be eligible for withholding of removal, a petitioner must establish that his or her "life or freedom would be threatened in that country because of [his or her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The applicant "must establish a 'clear probability of persecution,' meaning that 'it is more likely than not that [he or she] would be subject to persecution.'" *Al-Ghorbani*, 585 F.3d at 993-94 (quoting *INS v. Stevic*, 467 U.S. 407, 413, 424 (1984)). "A few isolated incidents of verbal harassment or intimidation" do not qualify as "persecution," particularly when those incidents are "unaccompanied by any physical punishment, infliction of harm, or significant deprivation of

liberty." *Mikhailevitch v. INS*, 146 F. 3d 384, 390 (6th Cir. 1998). While the applicant bears the initial burden of proof, once that burden is satisfied, withholding of removal is mandatory and automatic. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987).

### 3. Maria and Pablo's Claim for Asylum and Witholding of Removal

Substantial evidence supports the BIA's decision to dismiss Petitioners' application for asylum and withholding of removal. Under 8 U.S.C. § 1158(b)(1)(B)(i), Maria and Pablo had to establish a nexus between their membership in a particular social group and the persecution they would face back home in El Salvador. Both Maria and Pablo testified about how their social status as "members of Cesar's immediate family" would subject them to further violence if they returned to El Salvador. Maria testified that the gang members who extorted her son Cesar were the same who shot and killed her husband months later. The IJ determined that their social status as "members of Cesar's immediate family" qualified them as members of an immutable, particular, and socially distinct group. But the IJ then ruled, and the BIA thereafter affirmed, that Petitioners were unable to clearly establish the required nexus between their social status as members of Cesar's immediate family and the motives of the criminal gang members in El Salvador who shot and killed Maria's husband. Upon review, nothing in the record suggested that the assailants who murdered Maria's husband Juan were the same gang members who had initially threatened Cesar. Indeed, Maria's husband was murdered in a location two hours away from the place where Maria received the initial gang threats.

Additionally, during a merits hearing, Cesar testified that his father was never harmed after gangs learned of Cesar's profitable father-son farming business. After being questioned by the IJ, Cesar was unable to explain why the gang threatened him, but did not threaten his father, who continues to live in El Salvador. The IJ found this fact to run counter to the existence of a nexus

between the subsequent threats Maria received and her status as a member of Cesar's immediate family. If anything, the IJ found that the evidence suggested that "the shooting, which took the life of Maria's husband and wounded her son, was a tragic but common incident of indiscriminate gang violence within El Salvador." (AR 48.) Thus, in finding that Maria and Pablo were victims of generalized gang violence, the BIA determined that "the respondents' potential vulnerability to gang-related criminal activity [did] not establish a nexus to a protected ground," i.e., their status as members of Cesar's immediate family. (AR 04.)

Further, to obtain asylum, Petitioners must additionally establish that El Salvador would be unwilling or unable to protect them because their assailants were non-state actors. *See K.H.*, 920 F.3d at 475. Petitioners argued that the corruption in El Salvador would prevent them from seeking protection from the police. But the record showed how police officers assisted the family immediately following the shooting of Maria's husband Juan. And in reference to the general country conditions in El Salvador, the IJ found that the Salvadorian government had taken recent steps to curb gang violence amongst the police, including establishing a new internal investigative office and removing 600 members with gang ties from its ranks. The IJ questioned why the Petitioners never contacted the police about the initial threats they received before Maria's husband was killed, since "no government can protect its citizens from activities it is not made aware of." (AR 13.)

Given the great deference provided to the BIA's reasoning, this court will "not reverse such findings simply because we [could decide] them differently." *Al-Ghorbani*, 585 F.3d at 991. Taken "as a whole," the BIA's findings of fact are "reasonable, substantial, and probative" such that this court will defer to its judgment. *Guzman-Vazquez*, 959 F.3d at 259 (quoting *Abdurakhmanov*, 735 F.3d at 345). Under the facts, a "reasonable adjudicator would [not] be

compelled to conclude to the contrary." *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B). Therefore, substantial evidence exists to support the BIA's findings, and we affirm the BIA's decision.

## III.    CONCLUSION

For the reasons set forth above, we deny Petitioners' application.