NOT RECOMMENDED FOR PUBLICATION
FILE NAME: 23A0379N.06

Case No. 22-4002

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

IBTISAM NAYED, et al.,

 Petitioners,

 v.

MERRICK B. GARLAND, Attorney General,

 Respondent.

)
)
)
)
)
)
)
)
)
)

FILED
Aug 15, 2023
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW FROM THE BOARD OF IMMIGRATION APPEALS

OPINION

---

**Before: BATCHELDER, COLE, and NALBANDIAN, Circuit Judges.**

BATCHELDER, J., delivered the opinion of the court in which COLE and NALBANDIAN, JJ., joined. COLE, J. (pg. 10), delivered a separate concurring opinion.

**ALICE M. BATCHELDER, Circuit Judge.** Ibtisam Nayed, acting on behalf of herself and her two minor children (derivative petitioners), sought asylum, withholding of removal, and protection under the Convention Against Torture (CAT). An Immigration Judge (IJ) denied her application and Nayed appealed to the Board of Immigration Appeals (BIA). The BIA dismissed that appeal and Nayed petitions this court for further review. We DENY the petition.

**I.**

The lead petitioner, Ibtisam Nayed, is a 46-year-old native and citizen of Libya. The other two (derivative) petitioners are her two minor children, both born in the United Kingdom. They entered the United States in 2015 on Nayed's student visa, after which she withdrew from school and overstayed the visa. She sought asylum, withholding of removal, and CAT protection based on her fear of returning to Libya. Nayed claimed protection as a member of the Zintani Tribe, which supports Libya's recognized official government and opposes the militias.

Back in 2014, at the beginning of the most recent (or current) Libyan civil war, Islamist militias overwhelmed the Tripoli Airport and its surrounding communities, which had been defended in large measure by Zintanis, and was where Nayed lived. These Zintanis, including Nayed, retreated to their mountain village about 100 miles from Tripoli. This revolutionary warfare continued for another six years and, arguably, continues still. After Nayed fled, her abandoned house was destroyed. Since then, a nephew suffered injuries from an explosion while serving in the Libyan military. Another died at a checkpoint in Tripoli. And Nayed asserted that she has had other relatives kidnapped and killed during this ongoing civil war.

Five of Nayed's siblings lived in Zintan for at least six years (from 2014 until the immigration hearing in 2021) without harm by any militia. Despite Nayed's insistence that militias target the Zintanis, she produced no evidence of any militia attacks on Zintan. Nayed's expert, Dr. Jacob Mundy, testified about the frightening civil-war conditions in Libya, none of which is in dispute, but he could not provide one example in which a militia group harmed a Zintani since 2014. The Libya Country Conditions Report submitted for the record did not mention Zintan at all.

Dr. Mundy testified that, despite a ceasefire agreement in 2020 and an internationally recognized central government in 2021, warfare and oppression continue throughout Libya due to the "proliferation of militias," some of which are affiliated with competing political parties (ideologies), some of which are "professionalized" by foreign support (from Turkey and Qatar), and some of which are "just outright criminals or Islamic terrorists." Different militias control different ports of entry and roadway checkpoints, making travel particularly dangerous. And apart from the political or military combat, "there's still a lot of vendettas today and revenge seeking, kidnappings for ransom." The formal government struggles to control this.

At the hearing, the IJ found Nayed and her expert generally credible and accepted a written statement from Nayed's sister, who was granted asylum in 2019. Like her sister, Nayed claimed asylum based on her membership in the Zintani tribe and an imputed pro-government political opinion. But the IJ determined that Nayed had never been harmed physically by militia groups and had not suffered any past persecution. The IJ also determined that Nayed had never had any personal contact with any militia, that no militia was specifically looking for her, and that five of her siblings had lived safely in Zintan since 2014, so she had not shown that she would be individually targeted if she returned. And, given the absence of any evidence that any Zintani had been harmed since 2014, she had not shown a pattern or practice of persecution of similarly situated people based on her group or imputed political opinion. The IJ held that Nayed had not shown a well-founded fear of future persecution. Nor had she shown that the government was unable or unwilling to protect her.

On those same factual findings, the IJ held that Nayed had not met the higher burden for withholding of removal or CAT protection, as she had not shown that it was "more likely than not" that she would be harmed by anyone for any reason, or tortured by the government, if she were returned to Libya. Thus, the IJ denied asylum, withholding, and CAT relief.

In her notice of appeal to the BIA, Nayed raised several claims, including two—(1) that her past persecution entitled her to the rebuttable presumption of a well-founded fear of future persecution and (2) that the Libyan government is unable or unwilling to protect her—for which she did not include any factual support; nor did she mention those claims at all in her appellate briefing to the BIA. The BIA rejected those two claims as waived.

In her briefing to the BIA, Nayed argued her fear of future persecution based on her testimony that the militias had targeted her family and other Zintanis in the past, and her expert's

3

testimony "that the militia violence is severe and unrestrained throughout Libya." But, as the IJ had found, the BIA found that she had no evidence that the militias would target her in particular when, as of the time of the hearing, her "similarly situated siblings have lived in Zintan for approximately 6 years unharmed"; and her expert had no evidence "that people from Zintan have been targeted by militias since 2014." The BIA determined that her fear was not well founded and denied her asylum claim. The BIA rejected her withholding and CAT claims on the same basis.

Nayed had also claimed that the IJ did not adequately address the written statement that her sister had provided, but the BIA answered that Nayed "has not adequately explained how her sister's statement, which is similar to [Nayed]'s testimony, affects the dispositive issues of her case." Therefore, the BIA did not consider this contention further.

Nayed petitions for further review here raising six arguments.

**II.**

When the BIA issues an opinion, rather than a summary affirmance, we review that BIA opinion as the final agency decision. *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). We review questions of law de novo, but under the highly deferential substantial-evidence standard, the BIA's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

"An asylum applicant bears the burden of demonstrating that she qualifies as a refugee by establishing either that she has suffered actual past persecution or that she has a well-founded fear of future persecution." *K.H. v. Barr*, 920 F.3d 470, 475 (6th Cir. 2019) (quotation marks, editorial marks, and citation omitted). To qualify as a refugee, an individual must show the persecution was or would be based on "race, religion, nationality, membership in a particular social group, or political opinion." *Id.* (citation omitted) (interpreting 8 U.S.C. § 1101(a)(42)(A)). "When an

asylum claim focuses on non-governmental conduct, the applicant must show that the alleged persecutor is either aligned with the government or that the government is unwilling or unable to control [the persecutor]." *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020).

For withholding-of-removal claims, the applicant must show that it is "more likely than not that [] she will be subject to persecution upon deportation" on account of one of the statutory factors listed above. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987) (interpreting 8 U.S.C. § 1231(b)(3)(A)). "This more-likely-than-not test sets a higher bar to relief than the well-founded-fear test required for asylum." *Mbonga v. Garland*, 18 F.4th 889, 899 (6th Cir. 2021). "To obtain relief under [the] CAT, the applicant bears the burden of establishing it is more likely than not that [] she would be tortured if removed to the proposed country of removal." *Marqus v. Barr*, 968 F.3d 583, 589 (6th Cir. 2020) (quotation marks and citation omitted). "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1139 (6th Cir. 2010) (quotation and editorial marks omitted); 8 C.F.R. § 1208.18(a)(1)).

**A.**

Nayed argues that the IJ improperly failed to consider and rely on *all* of her expert's testimony. She points to *Marouf v. Lynch*, 811 F.3d 174, 182 (6th Cir. 2016) (holding that an IJ cannot "'cherry pick' facts or inconsistencies to support an adverse credibility finding that is unsupported by the record as a whole" (quotation marks and citation omitted)), among other cases, for the proposition that an IJ cannot "cherry pick" portions of an expert's testimony to support a determination about county conditions or the likelihood of persecution.

Assuming that *Marouf* applies as she contends (and not just to credibility findings), she criticizes the IJ's reliance on her expert's concession that he had no example of any Zintanis' having been targeted or harmed anywhere in Libya because they were Zintani. She says the IJ should have instead assumed that Zintanis have been targeted by relying on her expert's testimony that only "high profile" murders are publicized while "day-to-day killings" of "average everyday citizens" are not reported with "a lot of fine grain detail."

The problem with Nayed's theory is plain. The evidence presented about the rampant persecution of "average everyday citizens" does not prove her contention that Zintanis are being specifically targeted for persecution. To obtain relief, it is not enough to show that thousands of "average everyday citizens" have fled persecution to exile because the national government cannot protect them. Nayed had to prove that she would be specifically targeted as a member of a particular social group, namely Zintanis, which her expert concededly did not do. *See Trujillo Diaz v. Sessions*, 880 F.3d 244, 250 (6th Cir. 2018) ("The feared persecution must relate to the alien individually, not to the population generally." (quotation marks and citation omitted)). Nayed does provide evidence that she would be specifically targeted.

**B.**

Nayed argues that the IJ failed to credit her sister's written statement, including the fact that her sister had been granted asylum in 2019, as sufficient evidence to establish her claim for asylum based on her sister's claim because it was "virtually" identical.

The IJ admitted her sister's statement and addressed it on the record at Nayed's hearing. And the BIA found that, even if the IJ had not adequately addressed her sister's statement, Nayed did not explain how her sister's statement, "which is similar to [her own] testimony, affects the dipositive issues of the case." Nayed has not provided us with any reason to find otherwise.

To the extent that Nayed argues that she should receive asylum because her sister did, we have held that "[f]avorable adjudications on the asylum applications of even immediate family members, however, [are] not dispositive of any petitioner's application." *Shkreli v. Gonzales*, 219 F. App'x 474, 478 (6th Cir. 2007); *see also Aktar v. Gonzales*, 406 F.3d 399, 406 (6th Cir. 2006) (finding that a petitioner "cannot rely solely on the persecution of [] family members to qualify for asylum" (quotation marks and citation omitted)). There is also a noteworthy difference between Nayed's application and her sister's: her sister's asylum application and its attached declaration of her past persecution were made in July 2015, so the above-described events of 2014 were still timely when presented to the IJ.

While her sister's statement here, dated October 2021, mostly just reiterated the events from 2014, it also included a story of a militia's targeting a Zintani man in 2017. Among the numerous documents attached to the sister's statement was a printout from Facebook of a photo (of a dead man) dated October 2017, with a translated caption: "The martyr who defended his family and honor in the treacherous attack on the returnees on his home in Hajjar; Hajj Muhammad bin Aoun Al-Rassi Al-Zintani, may God have mercy on you, O Saqr (hawk)." Relying on that caption, the sister alleged that "the militias that are allies to the militias in the capital Tripoli" murdered a man in 2017, "in a different city in southern Libya," presumably meaning Hajjar, "for no reason except that he is from Zintan, and he was trying to protect his family members." Even accepting that "Al-Zintani" establishes that the man was from Zintan, the caption does not say that militias killed him, much less Tripoli-affiliated militias, or that it was because he was from Zintan. Nor does the sister claim personal knowledge of this man or this event. She merely says: "We translated the document that contains this information and attached it to the new documents we provided."

The BIA determined that Nayed's sister's statement adds nothing to Nayed's own hearing testimony and would not affect the IJ's decision, and Nayed offers nothing to refute this. We do not disturb this finding.

**C.**

Nayed argues that the IJ's and BIA's treatment of her expert's and her sister's information made the hearing fundamentally unfair because the "immigration judge cannot be said to have fairly considered the evidence presented," so she was "deprived of due process." *See Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005). As already discussed, the IJ and BIA considered her expert's and her sister's information. So, to the extent that her actual contention is that the IJ and BIA "did not weigh the evidence as [she] wished," that is not a denial of due process. *See Lopez-Soto v. Garland*, 857 F. App'x 848, 855 (6th Cir. 2021).

**D.**

Nayed argues that she proved past persecution through her testimony that the militias burned her abandoned home when they overran the Tripoli Airport in the 2014 revolution, that militias killed her nephew at a checkpoint, and that it was likely a militia that kidnapped her brother-in-law for ransom. The BIA rejected this argument by finding that Nayed had waived it by failing to raise it in her briefing.

"We look to the alien's brief before the BIA to determine which claims the alien adequately raised before that body." *Cuevas-Nuno v. Barr*, 969 F.3d 331, 334–35 (6th Cir. 2020) (citation and footnote omitted). "Where the alien *does* file a separate written brief, all issues not raised in an appellant's briefs are waived, even if the issue has been raised in the notice of appeal." *Id* (quotation marks, editorial marks, and citation omitted); *accord Alvarenga-Canales v. Garland*, No. 22-3514, 2023 WL 3094545, at \*2 (6th Cir. Apr. 26, 2023). Because Nayed did not raise this

issue in her brief to the BIA, the BIA did not err in deeming it waived, and we decline to consider it.

**E.**

Nayed argues that she proved a well-founded fear of future persecution. The BIA determined that her fear was not well-founded because she had no evidence that the militias would target her in particular, as somehow different from her siblings who had lived in Zintan for at least six years unharmed, and because her expert had no evidence that people from Zintan have been targeted by militias in the years since 2014.

Nayed points to her hearing testimony, in which she said the militias would target her and her family if they return to Libya because she is readily recognizable as a Zintani due to her name and accent, and because the Zintani tribe is pro-government and, therefore, an enemy of the militias. But the BIA's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Umaña-Ramos*, 724 F.3d at 670. Nayed's testimony, which she presented to the IJ and BIA, does not compel us to conclude to the contrary. And because Nayed failed to show eligibility for asylum, she necessarily does not qualify for withholding of removal. *See Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005).

**F.**

As for her CAT claim, Nayed argues that she proved a "clear probability" that she and her family will be persecuted and tortured if returned to Libya, based on her testimony that the militias would target her as a Zintani, would discover her anywhere and everywhere in the country, and would commit rampant persecution and torture that the Libyan government is unable or unwilling to prevent. But, as with the prior issue, the BIA determined that she had no evidence that the militias would target her in particular or even that Zintanis are currently being targeted, those

findings are conclusive unless her evidence would compel a contrary conclusion. Her personal testimony about country conditions in Libya does not meet that standard.

**III.**

For the foregoing reasons, we DENY the petition for review.

**COLE, Circuit Judge, concurring.** Because I agree that the petitioner is not entitled to relief under our immigration jurisprudence, I would also deny the petition for further review. I write separately to acknowledge the plight Libyans face due to widespread warfare and oppression inflicted by various militias across Africa and specifically in Libya. There is no question that tribal-affiliated Libyans, like Nayed and her siblings and children, endure hardships because of the deadly nature of identity politics in Libya. Her sister successfully sought asylum based on the same hardships Nayed alleges, emphasizing the legitimacy of Nayed's fear. But we are governed by precedent that does not allow us to grant relief in this instance: Nayed unfortunately faced a steeper uphill battle than her sister, as her sister's application was approved outside of the court system.

And substantively, the instances of violence against Zintanis were temporally closer to her sister's application. Our hands are tied by the fact the IJ and BIA here did not find her sister's grant of asylum to be dispositive on account of these differences. Even where a petitioner presents another legitimate view of the facts based on items in the record, and even if I may have adopted that alternative view in the first instance, we cannot substitute the BIA's factual findings with our own. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004); *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992).

Absent an error of law and so long as the conclusions flowing from these conclusive findings of fact do not compel a contrary result—as is the case here—we must deny the petition. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009); *see also* 8 U.S.C. § 1252(b)(4)(B).